**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

HENRY GEORGE TAFFE,                           Case No. 1:23-cv-700

             Plaintiff                           Barrett, J.
                                              Bowman, M.J.

        v.

GIVAUDAN FLAVORS CORPORATION,

             Defendant

**REPORT AND RECOMMENDATION**

Plaintiff Henry George Taffe, a black man, was hired by Givaudan Flavors Corporation in late August 2021. Seven months later in March 2022, he complained of two incidents of racial discrimination and asked to remain off work while the company investigated. Defendant's investigation did not support Plaintiff's complaints. Then, in meetings held in April and May 2022, Plaintiff did not accept the results of the investigation or return to work. The stalemate continued. Defendant both expanded its investigation and continued to pay Plaintiff. But Plaintiff never returned to work. Instead, after nearly six months of paid administrative leave, Defendant terminated Plaintiff, citing his unacceptable behavior during meetings with company representatives and "refusal to have a respectful two way discussion … regarding your return to the mechanic role for which you were hired."

Plaintiff filed suit for race discrimination and retaliation under 42 U.S.C. § 1981. The case is now before the Court on Defendant's motion for summary judgment, which has been referred to the undersigned magistrate judge for initial consideration and a

1

report and recommendation. In addition to the motion for summary judgment, Defendant has filed a motion for sanctions for spoliation. For the following reasons, the undersigned recommends that Defendant's motion for summary judgment be granted, and that Defendant's motion for sanctions be denied as moot.

## I.    Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  And Defendant, as the moving party, has the burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). However, once the moving party has met its burden of production, the nonmoving party cannot rest on her pleadings, but must present significant probative evidence to defeat the motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). !

After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).  In order to defeat the motion for summary judgment, the

2

non-moving party must present probative evidence that supports its complaint. *Anderson*, 477 U.S. at 249-50.  The court then determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52. To demonstrate a genuine issue of fact, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## II.    Findings of Fact

In August 2021, Givaudan maintenance supervisor Mike Scheben interviewed Plaintiff Taffe as a third-shift maintenance mechanic II at Givaudan's Carthage facility. Plaintiff identifies as black or African American.[1] Scheben was so impressed with Taffe that, within minutes of his interview, he told HR to offer Taffe the job. At the same time, Givaudan hired Bengie Whittle, a white or Caucasian man, as a second-shift maintenance mechanic I at the Carthage facility. (Taffe Dep., Doc. 19-1, PageID 101; Bell Dep., Doc. 25-3, PageID 575.) Givaudan hired Taffe at a higher mechanic level than Whittle and paid Taffe three dollars more per hour than Whittle (Doc. 19-1, PageID 62; Doc. 19-2, PageID 117; Doc. 29-1 at ¶ 2.) While Taffe and Whittle were both offered sign-on bonuses, Taffe was eligible to receive his after 30 days of employment, while Whittle had to wait 60 days to receive his. (*Id.*)

---

[1]Plaintiff's complaint uses the term "African American" but in audio recordings filed of record, refers to himself as "black." In *Smith v. P.A.M. Transport, Inc.*, 154 F.4th 375 (6th Cir. 2025), the court recognized that "caselaw reflects the basic reality that "[c]olor-based language denotes race in common parlance: [c]olor terms such as 'Black' and 'White' commonly designate specific racial groups." Id. at 387, quoting Vinay Harpalani, *Civil Rights Law in Living Color*, 79 Md. L. Rev. 881, 887-88 (2020).

Taffe and Whittle began work on the same day, August 23, 2021. (*Id*.) Though hired for different shifts, they went through new hire training together from August 23 to September 6, 2021. (Doc. 19-1, PageID 64; Doc. 25-3, PageID 575.) Taffe made no complaint during training, or for the next seven months. Around March 19, 2022, another mechanic, Marshall Stevens, left Givaudan. At the time, Taffe told his supervisor and multiple co-workers (including Whittle) that he wanted Stevens's toolbox. A "toolbox" is a Givaudan-owned work bench with a toolbox on top where employees store their Givaudan tools and personal effects. No one objected to Taffe's request. But on Stevens's last day, while Taffe was off work, Whittle took possession of Stevens's toolbox. (Doc. 19-1, PageID 72-73; Doc. 25-3, PageID 574, 577.)

When Taffe returned to work and saw that Whittle had taken the toolbox, he stated that he would not be bullied. (Doc. 19-1, PageID 73). Thereafter, two maintenance workers put up "no bullying" signs. The signs were swiftly removed - apparently before either Whittle or Taffe saw them - and the two men were subsequently fired. (Doc. 25-3, PageID 582-583.)

On Friday, March 25, 2022, Taffe and Whittle both complained to a manager, Dan Unterer, and to a maintenance lead, Marty Jones, about the toolbox. Ultimately Whittle agreed to move to another toolbox. (Doc. 27-3, PageID 894.) In a conversation with another mechanic, Taffe inquired if Whittle was going to go to HR about the toolbox. Taffe then stated that he was upset about the toolbox in part because Whittle had used a highly offensive racial slur, the n-word, during their shared orientation nearly seven months earlier.[2] (Doc. 19-1, PageID 73; Doc. 25-3, PageID 580-81.) Taffe later repeated his

---

[2]Plaintiff has made inconsistent statements about whether Whittle spoke or sang the offensive word. In his EEOC charge, Taffe stated that Whittle had "used the n-word in my presence while singing along to a song."

assertion to Unterer that Whittle had directed the n-word toward him during orientation. (Doc. 19-1, PageID 74.) Taffe reported that he felt unsafe continuing to work at the plant. He testified that Unterer told him to leave for the night and that HR would follow up. (*Id.*; *see also* Doc. 27-3, PageID 894-895.)

On Saturday morning, March 26, Taffe texted HR manager Allison DeGraaf to report that Whittle had used a racial word, writing: Good morning this is George. I'm text[ing] you to notify me by email. gerogetaffe@yahoo.com. I have reported racial word towards me by Benjamin. I also believe I have received different consequences than my peers. Thank you I look forward to your reply. (Doc. 19-2, PageID 186; Doc. 19-1, PageID 75.)

DeGraaf promptly replied that Givaudan takes his concerns very seriously and asked Taffe to provide a statement so she could start investigating (*Id.*) DeGraaf followed up with an email:

> As I mentioned in my text message I take your concerns very seriously. Please provide a statement of events/concerns that I can use to investigate. Once I have that information I will arrange a time for us to meet. When are you scheduled to work next?

(Doc. 19-3, PageID 224-25; Doc. 19-1, PageID 75-77.)

Taffe stated he was scheduled to work that night and asked if he should report. Four minutes later, Taffe emailed that he did not "feel comfortable going in." DeGraaf responded that Unterer "has a plan to adjust schedules so you and Benji will not overlap. Could you connect with Dan and see if we can make this work temporarily while we

---

(Doc. 19-1, PageID 109-110; *see also* Doc. 1, ¶ 11, PageID 3 (alleging that Whittle "used racial slurs in [Plaintiff's] presence while singing along to a song.") But Taffe testified in his deposition that he was unsure "if there was music playing" when Whittle said the n-word or whether Whittle was singing to a song. (Doc. 19-1, PageID 78.)

investigate?" Taffe responded that he did not have Unterer's contact information and added: "I don't think this is fair in my judgment." (*Id.*)

DeGraaf then asked Taffe to call her and provided her cell phone number. Taffe responded with three emails, saying "I would rather not chat [by] phone" and "This is serious and not to be taken lightly" and "Do I report to work at 11:30?" (*Id.*) DeGraaf responded by email:

> I am taking this issue very seriously and felt a phone call today would be appropriate to discuss your work schedule for the weekend. Dan has arranged for Benji to leave work by 10 and I understand they reached out to you and asked you to start at 11:00. I will leave the decision on whether [to] work tonight up to you. Please let me know your decision.

(*Id.*) Taffe decided not to work, writing: "I would rather you do the investigation. Can you schedule a time to talk?" DeGraaf offered to meet on Monday morning and again asked Taffe to send his written statement in advance. Taffe complained: "You never asked for a written statement for any other investigation" but offered to "bring what I have." (Doc. 25-3, PageID 610.) Taffe agreed to meet Tuesday. (*Id.*) He never provided a written statement. (Doc. 19-1, PageID 76-77; DeGraaf Aff. ¶ 3.)

On March 29, 2022, DeGraaf and site development supervisor Patric Montgomery, a bi-racial man who Taffe respected, met with Taffe to discuss his complaint. At that time, Taffe identified three incidents of race discrimination: (1) Whittle's alleged utterance of the n-word in the presence of Taffe and two white coworkers during training in late August or early September 2021 (Doc. 19-1, PageID 79-80; DeGraaf Dep., Doc. 27-1, PageID 810-811); (2) Scheben's issuance of a verbal attendance warning to Taffe but not to Whittle (Doc. 19-1, PageID 77, 99); and (3) that Defendant had not included Taffe "in the

talkings for a lead position" even though he was the "best" maintenance mechanic on the second and third shifts. (Doc. 19-1, PageID 77, 99, 101; Doc. 27-3, PageID 896-97.)

During the March 29 meeting, Taffe asserted that his "life was in danger if [he] reported to work at Givaudan." (Doc. 19-1, PageID 77.) Taffe said that he did not feel safe because his co-workers could push him off the roof and he could get blown up. (Doc. 19-1, PageID 79.) Given Plaintiff's complaints and stated fears for his personal safety, DeGraaff told Taffe he could continue off work with full pay while the Company investigated. (Doc. 19-1, PageID 76, 80, 90, 96.) On March 31, Taffe asked if his pay while on leave would include all time for which he had been scheduled to work, including overtime. (Doc. 25-3, PageID 612).

Thereafter, DeGraaf conducted an internal investigation, during which Whittle denied using the n-word and reported he thought he and Taffe were friends, showing DeGraaf multiple friendly text messages. (DeGraaf Aff. ¶ 4; Doc. 27-3, PageID 902-03.) The two coworkers that Taffe had identified as witnesses also denied hearing Whittle use the n-word. (Doc. 27-3, PageID 896-97; Doc. 27-1, PageID 786). Other employees also denied that Whittle had ever used the slur, and consistently reported that they thought Whittle and Taffe were friends. (DeGraaf Aff ¶ 5; Hotopp Dep., Doc. 28-1, PageID 938.)

In addition to the n-word investigation, DeGraaf investigated whether Scheben had disciplined Taffe more severely than Whittle for an attendance violation. But she determined that Scheben had given Whittle a similar attendance warning. (Doc. 26-3, PageID 738-39; Doc. 27-1, PageID 793-94; DeGraaf Aff., Doc. 29-6 at ¶ 6; Doc. 29-7.) Although the record reflects a small difference in the font size and wording of the two warnings, (*see* Doc. 25-3, PageID 585-586), another investigator attributed the difference

to "sloppy recordkeeping." (Doc. 25-3, PageID 599). Nevertheless, DeGraaf removed the discipline from Taffe's record while leaving Whittle's discipline in place.

DeGraaf also found no merit to Taffe's suggestion that he had not been promoted to lead based on his race. Her investigation confirmed that there had been no postings for a lead position during the seven months that Taffe had been employed. In addition, Defendant had never promoted anyone to a lead position at Carthage who had not worked there for three years. (Doc. 27-3, PageID 901; Doc. 27-1, PageID 787-88.)

On April 25, 2022, DeGraaf called Taffe to a meeting to discuss her conclusions. In addition to DeGraaf and Montgomery, Unterer and plant manager Doug South attended the meeting, which Taffe secretly recorded. DeGraaf advised that she had found no inconsistent treatment or race discrimination, but stated she was removing the attendance warning due to ambiguity concerning whether the policy had been clearly communicated. She explained there had been no lead roles posted, and that no one could substantiate Taffe's allegation that Whittle had uttered the n-word back in August or September 2021. (Doc. 19-1, PageID 81; April 25 Recording, Doc. 21, 2:40-6:00.)

At virtually every turn, Taffe argued with company representatives and rejected the legitimacy of Defendant's findings. When he did so, DeGraaf further explained the basis for her findings. For example, with respect to the lack of open lead positions, and Taffe's assertion that an unspecified co-worker told him that a supervisor had spoken with that co-worker about a future lead position, she explained that people "routinely talk to folks….where do you want to grow your career?" but insisted "there's not been a lead promised to anyone." Taffe strongly disagreed. (April 25 Recording, 32:30-33:35.) He flatly rejected all non-discriminatory explanations, insisting that because he was "the best"

electrician on either second or third shifts, he – rather than anyone else - should have been talked to about the future position. (*Id.*, 31:20-32:28; *see also id.*, 14:00-15:15.)

Taffe similarly rejected the explanation that both he and Whittle had received attendance warnings, suggesting that racism was both the cause for Whittle receiving the same (rather than more severe) discipline and was at play in Defendant's removal of Taffe's warning.

> [I]f that had been me I would've been terminated…. The reason why you're trying to remove the write-up is because you knew it was wrong for me to get a write-up and him to get the same write-up when he had no days left [a worse violation]…. When a guy has personal time and sick time and they white - …let me give it to you [a] simple way – and they white, them days is maneuvered in [their] favor but when they not white [they're] not maneuvered in their favor….

(*Id.*, 37:30-39:51.) When DeGraaf protested, Taffe interrupted and continued his soliloquy. "We can bend the rules. We can bend them more when you're white than we can when you're black." (*Id.*, 40:27-40:33.)

Plaintiff repeatedly voiced his displeasure with the presence of the materials manager and plant manager at the April meeting. (*See, e.g.*, Apr. 25 Recording, 17:20-18:00; *see also id.*, 6:00-17:10, 18:09-18:12 and 18:43-18:45.) He disagreed with South's explanation that he was present to show how seriously Defendant took his allegations, and to help make sure that Plaintiff was able to return to work. (*Id.*, 18:00-18:45). On multiple occasions, Taffe interrupted and spoke over South. He referred to South as "the big boss man" and alleged that a "long pattern of racism" existed with Givaudan seeking "to pacify me like this never happened." (*Id.*, 42:30-43:05.) Taffe concluded with an emphatic description of how he interpreted Defendant's position:

> I see this this way. You is the only black - you should be happy that you in the department. You should be happy that you're here because if you ain't

9

> happy, we got a friend of yours who's another colored guy… [and] he can
> be the token that you are….that's how I see it. That's the only way I see it
> and I'm not going to pretend that I see it any other way.

(*Id.*, 41:45-42:10.)

Throughout the meeting, Taffe brought up additional complaints that he believed were proof of racism, stating: "I feel I'm in a hostile work environment" and adding that "some people who's non-color… think it's alright for somebody to present themselves and say they're a 'redneck'" which Plaintiff associated with "lynching" and racism. (*Id.*, 7:24-7:47.) He complained that Defendant recently had hired a Caucasian job applicant instead of a close friend of Taffe's. To Taffe, that proved racism because his friend was better qualified. (*Id.*, 12:00-12:30, 25:20-26:09; *see also* 31:05-31:15 ("What happened is, … Guy comes in, he's good, he's got color on in, he can't be too good").)) He complained that when his nephew Tevin had worked at Givaudan in the past, Tevin had been unfairly "cussed out" by managers. (*Id.*, 22:05-24:25.) When South responded that treating any employee with disrespect was not acceptable and would not be tolerated if brought to management's attention, and/or that Givaudan would consider Taffe's friend for any open positions for which he had applied, Plaintiff was dismissive. (*See id.,* 29:00-29:10, "you're not going to hire Paul because he's a friend of mine.")

Taffe was angry about his badge not working when he arrived to the meeting, insisting that fact "changed the whole tone," (*id.*, 18:35-18:40), and proved he had been "suspended." South denied that Plaintiff had been suspended and DeGraaf explained that Givaudan was merely honoring Plaintiff's "request[] not to be here." (*Id.*, 35:04-36:07.) But Taffe rejected their assurances that deactivating a badge for an extended leave is a "normal process." (*Id.*, 9:39-9:43; 26:56-27:15.) In addition to rejecting all non-

discriminatory explanations, Plaintiff asserted that Whittle should have been "suspended." (*Id.*, 20:07-20:25).[3]

Taffe further complained that Givaudan had violated its agreement to pay him his full wages, because he had not been paid overtime for which he had been scheduled and that "pre-existed," as well as what he would have earned. (*Id.*, 12:58-13:15.) When South asked for clarification, Plaintiff explained he was "every week short" because he would have been eligible for "overtime almost every day" due to Givaudan being short-handed. South responded agreeably, "Let's fix that, regardless of what you decide...." (*Id.*, 43:15-44:08). Thereafter, Defendant paid estimated overtime in addition to fulltime wages through May 31, 2022.

Throughout the April meeting, Taffe voiced concern that others would view him negatively because of his complaints, noting that no one in his old department had texted or called him in the weeks he had been off work. (*Id.*, 15:23-15:35). Plaintiff repeatedly questioned: "Do you think that you could go back in the department after you brought up those accusations?" (*Id.*, 15:40-15:45.) He accused the company of making him a "nice sandwich," but then putting "dog doo on the sandwich" and asking him to eat it. (*Id.*, 15:45-16:30; 26:30-26:37.) He stated that he felt unsafe and could not return because a coworker could push him off a silo if he came back to work. (*Id.*, 18:55-20:20.) In short, Taffe made abundantly clear that he neither agreed with Defendant's findings nor felt safe returning to work.

> I'm supposed to feel safe by going back in this same place and working to where I'm saying this is what kind of discriminating and hostile work

---

[3] DeGraaf and South also explained during the meeting that Plaintiff had not been "suspended" but that HR had merely accommodated his request not to return to work while the investigation continued. (*Id.*, 34:40-36:10, "you requested not to be here and we honored it...")

environment that you have, and here you're telling me it don't exist. But you
can't prove it by doing something different….

(*Id*., 28:45-29:01.)

South tried to redirect on multiple occasions, asking "what do we have to do to get
you back to work?" to no avail. (*Id*., 18:45-19:21 and 29:30-31:10.) Taffe continually
responded by questioning how he could return. Near the end of the meeting, Taffe stated
he needed more time to consider if he would return and/or under what circumstances.
When South stated that the "ball is in your court," Taffe agreed to let Defendants know by
Wednesday. (*Id*., 30:11.)

The next day on April 26, 2022, DeGraaf emailed Taffe to confirm that she had
removed the attendance warning and was "working to adjust your payroll for next week's
check as agreed" to reflect overtime. The email again asked Taffe to "let us know what
we can do to facilitate a successful transition back to work" and asked for a response by
the next day, before South went on vacation.  (Doc. 25-3, PageID 613.)

Taffe did not offer to return to the Carthage facility. Instead, on April 27, Taffe
emailed that he was concerned about a "continuing hostile work environment" at Carthage
(despite Defendant's findings) and asked to work at a different Givaudan facility, Edison.
(*Id*.) On April 28, DeGraaf responded that she would "discuss this with the leadership
team and get back to you early next week." (*Id*.)

On May 9, DeGraaf emailed Plaintiff to let him know that South had returned from
vacation and she would "be in touch with you soon." (*Id*., PageID 614.) On May 11, 2022,
DeGraaf wrote again, setting out the same internal investigation findings in writing
previously communicated to Plaintiff at the April 25 meeting. She explained that there
were no open positions at Edison, but offered that there was an open maintenance

position at the Devon, Kentucky site for which Taffe was welcome to apply if he wished. She reiterated that Defendant was eager for Taffe to return to Carthage, and asked if he planned to return on May 17 as "the start of your next work week." (Doc. 27-3, PageID 901.) Taffe did not respond to her question. Instead, he allegedly responded, "I would like to work at any location local that has a opportunity. Who I need to do? [sic]" (Doc. 25-3, PageID 617.)[4]

The day before the next work week on May 16, Taffe emailed to say that he hurt his knee cutting his grass and asked to use "all vacation days 8 and 1 float holiday 1 day" prior to returning to work. (Doc. 19-3, PageID 231.) Three minutes later, he added, "Will this be enough time to transfer?" DeGraaf wrote back to explain the process for extended medical absences, including a "return to work note" and – for an absence exceeding 5 days – the completion of Short Term Disability paperwork, which she provided. (*Id.*, PageID 232.) She also responded to his newly asserted interest in the Devon, Kentucky facility. Because Plaintiff did not have his Givaudan computer, she wrote: "I have added your employee profile for consideration for the Devon role." (*Id.*) She offered to reach out to the HR Manager at Devon on his behalf, but cautioned that a quick decision was unlikely. (*Id.*)

On May 22, Taffe texted DeGraaf to request an alternate schedule at Carthage of 7 pm to 3:30 a.m. in lieu of regular shift hours on the second or third shifts.[5] (Doc. 25-3, PageID 629.) DeGraaf said she would check with Taffe's supervisors. Because Taffe had been employed on third shift, she asked if third shift would work, to which Taffe responded

---

[4]Taffe incorrectly cited Doc. 27-3, PageID 901 as the location of that email. The Court located an *undated* email with the cited wording at Doc. 25-3, PageID 617.
[5]The record is silent on the issue of whether Whittle continued to work second shift.

"No not at all…." (*Id.*) When DeGraaf asked if 7-3:30 were the "only" hours he could work, Taffe did not answer other than to restate his desire for a position in Kentucky. (*Id.*) Eventually, he explained he wanted to "easy [sic] into second shi[f]ts" by working 7-3:30. DeGraaf offered to "accommodate a 3-4 week transition," but stated that "ultimately" he would need to choose either second or third shift.  (*Id.*, PageID 630.)

 On May 24, Taffe asked for "[a]ny word on the ky transfer." DeGraaf replied she would follow up the next day. (*Id.*, PageID 630-631.) On May 26, she emailed Taffe that she had learned the interview process had been completed "a couple of weeks ago," with the Kentucky position having been filled with an internal candidate. Her email states that she "asked them to let me know when they have additional openings," but that in the meantime, Defendant would like to meet on May 31 to discuss Taffe's return to Carthage.

Plaintiff again secretly recorded the May 31, 2022 meeting, which was attended by DeGraaf and two supervisors, Unterer and Scheben. At the outset, Unterer talked about Taffe's prior request for hours between the second and third shifts, stating that they would try to work with Taffe's request to work 7-3:30. Plaintiff interjected that he would work third shift so long as Givaudan allowed him to come in and get off a couple hours early, due to a "family thing." (May 31 Recording, 5:20-6:41.)

Veering from the relatively cordial start to the meeting, Plaintiff quickly launched into an angry tirade against Defendant and its findings:

> Here's the thing…. The way I see it is two ways. If you don't believe me, that means you have to believe him. And if you believe him, that means that you can't believe me. So either way, the way I take it is somebody's being called a liar. I won't allow myself for nothing else to register no matter what you say. So I don't wanna … I'm - I'm not  - I'm a man's man. Whatever I feel, nobody else, outside of God, is going to make me move to change that. So if I feel that this is what this man did and we went on this racist tant, then there's nothin inside of me gonna say, "that didn't happen," because I will

14

> go to my grave sayin' that it did. So if you don't find it by…listen, I've already talked to an attorney. He told me that if I don't come back to work I'm going to looked at as insubordination.

(Recording, 6:40- 7:30.)

> I don't want nobody blowing smoke. I don't like to be tickled if you understand what I'm sayin'. I said what I said. I stand on what I said. And I'm not going to pretend that I didn't say it nor am I going to pretend that, because you [said] that you didn't find fault, so that makes me see it as "somebody's telling me that I lied." No matter how you flip it, that's how I see it. So it didn't make a difference of how somebody else sees it, as long as the person who's …perception.

(*Id.*, 8:00-8:29.)

Taffe also reiterated his deep suspicion and anger that "too many people in this plant that knows that I brought up being discriminated against." (*Id.*, 8:58-9:02.)

> I see it simple. I brought up something, somebody told me that didn't happen. So you're telling me I lied! That's what you're telling me. That I lied! And no matter how you flip it, I don't want somebody to blow any smoke to tickle me to tell me something different.

(*Id.*, 9:26-9:42.) Plaintiff stated that "all this blew up" over a toolbox, which Taffe subjectively believed was based on racial animus. Taffe emphasized his point with the exclamation: "Fuck that [n-word]!" [6] (*Id.*, 10:08-10:17.)

Taffe accused Defendant of denying him a transfer in direct retaliation for his complaints, because they viewed him "as a liability instead of an asset." (*Id.*, 11:05-11:40.) He repeated his disagreements with the Defendant's investigation and findings, pausing only briefly to inquire about a prior black employee who had left the maintenance department. (*Id.*, 13:40-14:10). He warned:

> If somebody does something potentially wrong against me I won't let it go. …I'm not the kind to brush it off. No! I wanna make sure I know that scar is there. Not today, for the rest of my life. That's how it work!

---

[6]The undersigned refers to this highly offensive racial slur and/or its derivatives as the "n-word."

(*Id.*, 17:33-17:50.)

Throughout the meeting, he reiterated complaints about Whittle, the lead position he believed he was entitled to based on his "higher skill level," (*Id.*, 14:30-15:30), and the attendance warning. (*See id.*, 20:16-25:00.) He opined that if he were white, he would have already been promoted to lead. (*Id.*, 18:50-19:02.) When DeGraaf protested that no one had ever been promoted to lead at Carthage without working there at least 3 years, Plaintiff ignored and talked over her. (*Id.*, 19:19-20:00.)

Plaintiff complained that the attendance warning had "changed everything" and he would never trust the Company again. (*Id.*, 24:00, 25:00.) He stated that he told DeGraaf "months ago" that he was not happy and did not want to come back, and was not comfortable being there. (*Id.*, 28:43-28:48; *see also id.* at 34:25-34:27.) He repeated that he did not want to be in the plant and could not get past this, (*id.* at 43:04-43:33), and that he never wanted to come back. (*Id.* at 50:43-50:47.) But he also reiterated that he had been advised by counsel that if he did not return, it would be insubordination. (*Id.* at 34:50.)

Taffe interrupted others more at the May 31 meeting than he had in April. (*Id.* at 20:02, 20:17, 21:08, 23:45, 28:40, 29:37, 31:40, 33:50, 36:14, 38:15, 39:17, 40:09, 44:27.) He referred to himself as "boy" (*id.* at 23:50), said he was not going to go the back of the bus, (*id.* at 24:25-24:45), and said in an exaggerated tone, "yessum, boss, can I dance for you too, get you a glass of lemonade while we waits?" (*Id.* at 36:29.) DeGraaf tried to redirect Taffe by explaining the meeting was about getting him back to work. She warned, "this conversation is not working toward a collaborative outcome" (*Id.*, 29:15-29:33.)

DeGraaf reacted to the "yessum, boss" comment by stating that the comment was offensive, but Taffe replied that he sees things a little differently than somebody who "pretends" to know something about racism or color. When DeGraaf objected, Taffe launched into a story about his family history, saying that he had "two uncles going to Vietnam at the same time, both of them came out of a black woman's vagina." (*Id.* at 36:30-36:50; Doc. 19-1, PageID 88.) Taffe looked at DeGraaf when he made the "black woman's vagina" comment, repeating the phrase twice more. (May 31 Recording, 36:59-37:06.)

Expressing open dislike for plant manager South, Taffe also falsely accused South of telling him at the April meeting, "hey man, it don't make no difference if you went through some type of discrimination, get on back to work, boy, yessum, yessum." (*Id.*, 51:30-51:46).[7] When Taffe made the latter statement, he also shuffled his feet in a dance (which can be heard on the recording). At that point, DeGraaf responded by stating, "I think we're done here" and ended the nearly hour-long meeting. (*Id.*, 51:45-51:51; *see also* Doc. 19-1, PageID 89; Doc. 27-1, PageID 825-26; Doc. 27-3, PageID 904.)

DeGraaf testified she felt uncomfortable and disrespected as Taffe intentionally talked over her on May 31, and felt he was disrespectful to her because she was a woman. She asked her boss, Tracey Hotopp, to permit her not to meet alone with Taffe going forward. (Hotopp Dep., Doc. 28-1, PageID 943-45; Doc. 27-1, PageID 811, 819-20, 825-26.) Nevertheless, on the next day, June 1, DeGraaf notified Taffe that "[a]fter considering your feedback from our meeting yesterday, we have decided to proceed with an external team to investigate the concerns you raised." (Doc. 19-3, PageID 240.)

---

[7]The April 25, 2022 recording confirms that South said no such thing.

Defendant hired Frost, Brown, Todd attorney Deborah Adams. DeGraaf notified Taffe that Givaudan would continue paying him his 40-hour-per-week pay, but Defendant ceased paying him estimated overtime as of June 1, 2022.[8]

Taffe agreed to meet with Adams at her law firm on June 20. During the interview, Taffe told Adams he "was not satisfied with the results of the last meeting with the Company," and had spoken with an attorney who had advised him to go back to work or it would be insubordination. (Doc. 24-2, PageID 483.) Taffe accused Adams of not being neutral because she was paid by Defendant. He told her she had a reputation as a bulldog, and that she should view Taffe's relationship with Givaudan as a "no trust relationship, no trust whatsoever." (*Id*., PageID 483-484.) He complained about the attendance warning and the toolbox, but refused to answer any specific questions such as which supervisors told him that Scheben had discretion not to give him an attendance warning, or who used the racial slur or referred to him as boy. (*Id*., PageID 484-487.) During his interview, he denied saying that he didn't get a lead position, stating that "a white guy had been talked to about the lead position." (*Id*., PageID 486.)

Adams documented that Taffe told her several times that "the Company did a thorough investigation" (a statement he later denied making)[9] and that he "has to go with that investigation, and …simply wants to return to work." (*Id*., PageID 486-487.) But Adams' notes are silent on the issue of whether Taffe was agreeing to return to third shift or to the Carthage facility – two points of contention in the May 31 meeting.

---

[8]Although the parties agree that Givaudan ceased paying estimated overtime as of June 1, 2022, neither party cites to documentation of that fact. (*But see generally*, Doc. 25-3, PageID 574, n.4, report from Bell that DeGraaf cut off overtime based on Taffe's behavior at the May 31 meeting.)
[9]Contrary to Adams' notes, Taffe's sworn deposition testimony denies telling Adams that Defendant had conducted a "thorough investigation." (Doc. 19-1, PageID 91.)

The June 20 meeting between Adams and Taffe concluded when he asked, "Are we done here?" Adams stated she was not but that "obviously he was free to go," and he left. (*Id.*, PageID 487.) Based on her impression that Taffe had accepted Defendant's "thorough investigation" and was agreeable to returning to work, Adams did not proceed further.

DeGraaf was not always in the office and did not "have a whole lot of recollection… of that time" due in part to a "family trauma" involving a "sick child." (Doc. 27-1, PageID 829-830.)[10] On Monday, June 27, 2022, Taffe texted DeGraaf to ask about a "time-line on my return to work," emailing Adams a similar inquiry the same date. (Doc. 25-3, PageID 633; Doc 24-3, PageID 476.) DeGraaf responded, "let me follow up with the investigator [Adams] and get back to you."

Via email dated June 30, Adams provided Givaudan with a copy of her interview notes. (Doc. 24-2, PageID 482-487.) When she reviewed them, DeGraaf was concerned that Taffe's reported statements about Defendant's "thorough investigation" and wanting to return to work did not "align[] with what he said" at the April and May meetings. (Doc. 27-1, PageID 837.) She explained she felt

> really kind of stuck and not – not sure what to be doing. We had hoped that we'd have a little bit more substance on things that we could work through. And I would have raised the concerns to my leadership. But at this point, I really didn't know how to proceed.

(Doc. 27-1, PageID 837). In short, DeGraaf was stymied by her inability to reconcile Taffe's statements to Adams with his hostile behavior at the prior meetings, or with his

---

[10]DeGraaf left Givaudan in September 2022 for another company. (*Id.*, PageID 762.)

prior assertions that he did not want to return to Carthage because he believed his life was in danger.

Taffe periodically followed up with Givaudan in July, but DeGraaf provided few responses. On July 5, Taffe messaged: "I haven't heard anything any word on returning to work." (Doc. 25-3, PageID 633.) On July 7, DeGraaf responded "I will plan to call you tomorrow with an update." (*Id*.) On July 11, 2022, Taffe texted again "any word?" (*Id*., PageID 634.) DeGraaf did not reply. On July 22, Taffe texted DeGraaf "Good morning any time on when you will be following up with me." (*Id*.) On July 25, he texted, "are you still conducting the investigation?" and "Any word." DeGraaf responded that she was "still working on the investigation and hope to have it wrapped up this week. (*Id*.)

Instead of wrapping up at the end of July, Defendant engaged a second investigator, Cors & Bassett Attorney Sue Bell, on or about August 8. Defendant hired Bell to conduct a more thorough investigation than Adams had conducted, including witness interviews. (Doc. 27-1, PageID 842; Doc. 25-3, PageID 558-559.) On August 15, 2022, Taffe inquired, "You still working on the investigation?" On August 18, DeGraaf notified Taffe of its decision to engage Bell.

Taffe refused to cooperate with any further investigation.[11] (Doc. 19-1, PageID 92-93; Doc. 19-3, PageID 242-54.) Despite Taffe's refusal to meet, Bell interviewed 14 other employees and reviewed numerous documents provided by Defendant relating to his complaints. But Defendant did not provide Bell with Taffe's messages between June 27

---

[11]Bell and Taffe exchanged numerous messages as she attempted to set up an interview and obtain information. Taffe denied refusing to participate in response to one email in which Bell states: "It appears from your emails that you are unwilling to meet with me and participate in this independent investigation," (Doc. 25-3, PageID 560). But the undersigned credits Defendant's account that Taffe refused to cooperate with Bell's investigation because no reasonable jury could conclude otherwise based on the written record.

and late July 2022 in which Taffe requested updates about the status of the investigation and/or his return to work.

Bell's 29 page report was supported by 27 exhibits. (Doc. 25-3, PageID 572-602.) Consistent with DeGraaf's investigation, she concluded that Taffe's race discrimination complaints were without merit. (Doc. 25-3, PageID 598-600.) With respect to Whitte's alleged use of the n-word, Bell's report confirmed that all witnesses, including Montgomery (described as "a man of color"), "simply did not believe [Plaintiff's] allegation" that Whittle had ever used the slur. (Doc. 25-3, PageID 584.) The report acknowledged that over the months since Taffe left work, "it appears that Taffe's belief that he has been a victim of race discrimination or animus has continued to worsen," and that he was frustrated "regarding the length of time that has passed and multiple investigations without finality." (*Id.*, PageID 600.) Bell also concluded that there was "hesitancy among some members of management to allow [Taffe] to return to the workplace." (*Id.* at 598.)

South contacted Taffe on September 12 to request a meeting after receiving Bell's report. HR Director Hotopp and South went into the September 15 meeting with prepared talking points about returning Taffe to work, including a calculation of the overtime the Company would pay. (Doc. 29-1, ¶ 4; *see also* Docs. 29-4, 29-5). The same "talking points" also referred to Plaintiff's "unprofessional and unacceptable" behavior at the May 31 meeting and warned that such behavior "will not be tolerated." (Doc. 29-4, PageID 1465.)

South opened the meeting by stating it was to talk about a path forward, that the Company had engaged in three investigations with the third investigation being a "deep-dive," that no evidence was found of race discrimination, and they would like to get Taffe

back to work. (Doc. 19-1, PageID 94; Sept 15 Termination Recording, 3:16-3:43, 4:02-4:10.) From the start, Plaintiff angrily protested: "I was supposed to have a start date. This investigation with Deborah Adams was done in June. … I had responded to her on June 27th. We're in September." (*Id*., 5:37). Taffe was highly agitated, antagonistic and rude. He disclosed that he was recording halfway into the meeting. (*Id*., 6:00.) Similar to prior meetings, Taffe quickly launched into an accusatory rant in which, in part, he asserted that Defendant was retaliating against him. (*Id*., 6:51.) He complained that Givaudan had deliberately kept him off work during the investigation and reduced his pay, alluding to the failure to pay him estimated overtime pay since June 1.

When Hotopp explained that Defendant had hired Bell to conduct a more thorough investigation, Plaintiff angrily contradicted her, "no you didn't." (*Id*., 9:08.) Taffe then falsely accused South of telling Taffe that he would face a hostile work environment upon his return. Taffe so frequently interrupted Hotopp that South asked him to "give Tracey a moment to respond please?" (*Id*., 8:47; *see also id*., 6:10, 6:15, 6:22, 7:29, 9:00, 9:04, 9:08, 9:21, 10:30, 10:42.)

During his lengthy tirade, Plaintiff stated that he refused to be fired for insubordination and so would return if Defendant let him know "what shift you want me to go back to and what time." (*Id*., 10:13). After being almost continuously interrupted, Hotopp asked: "I think my question for you George is, is this the way that you'd like to work because this doesn't feel –" (*Id*., 10:23-10:31.) Taffe again interrupted, saying "Now I'm not going to quit a job making $35 an hour, ma'am" and "I'm not going to do it. I don't even want to be –" but did not complete his sentence. South said, "George, let Tracey ask the question … and think about the question and please answer because this is an

important question." Taffe again interrupted without answering. Based on Taffe's behavior, South and Hotopp ended the meeting. South stated, "We're not going to sit here and have this rehash." (*Id.*, 10:47.) Hotopp stated: "This is not a collaborative, productive conversation, and if we're not able to do that, we're not in a position to move forward." (*Id.*, 10:25-10:56.)

Following the September meeting, Hotopp and South terminated Taffe. Hotopp's termination letter states in part:

> On September 12, Doug South, Carthage Site Director, and I met with you to discuss your return to work …Our conversation could not progress because you repeatedly spoke over us saying that you've been retaliated against … You have repeatedly refused to have a respectful two way discussion with us regarding your return to the mechanic role for which you were hired. Allison and supervisors met with you on April 25 and May 31 with similar intent to return you to work as a mechanic. During those meetings, you did not let them speak. During the May 31 meeting, you yelled and used foul language. Your refusal to let us speak during meetings to discuss your return to work is inappropriate and unacceptable and prevents us from continuing your employment. The Company is terminating your employment effective September 19, 2022.

(Doc. 19-3, PageID 257; Doc. 19-1, PageID 96.) Following his termination, Plaintiff filed a charge alleging both race discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Notice of Right to Sue at Plaintiff's request in order for him to proceed with this lawsuit. (*See* Doc. 1-2.)

### III. Analysis

### A. Summary Judgment on Count 1 – Race Discrimination

Defendant is entitled to summary judgment on Plaintiff's first claim for race discrimination. Relevant to employment, 42 U.S.C. § 1981 states in part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts…." In *Amini v. Oberlin College*, 440 F.3d 350,

358 (6th Cir. 2006), the Sixth Circuit explained that § 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." To prevail on a claim under § 1981, a plaintiff must plead and prove that "(1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Id.*, 440 F.3d at 358. In *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020), the Supreme Court held that a plaintiff proceeding under § 1981 must prove that "but-for" race, he would not have suffered the alleged injury. Apart from that element, Plaintiff's state-law claims and his § 1981 claims are analyzed under the same framework used for Title VII claims. *Smith v. City of Toledo, Ohio*, 13 F.4th 508, 514 (6th Cir. 2021).

Plaintiff's opposition to Defendant's motion is based exclusively on his retaliation claim, which is a perceived abandonment of his race discrimination claim. *See Brown v. VHS of Michigan, Inc.*, 545 Fed. Appx. 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") Independent of the abandonment issue, however, Defendant is entitled to judgment based on Plaintiff's failure to present sufficient evidence that the Defendant discriminated against him on the basis of race, or that Plaintiff would not have suffered an injury "but for" his race.

Plaintiff's alleged evidence of race discrimination is extremely limited. Taffe made no report of race discrimination until nearly seven months after he alleges that he heard

a Caucasian co-worker, Bengie Whittle, utter a racial epitaph on a single occasion. Plaintiff registered his complaint in connection with an unrelated dispute about a toolbox.[12] The toolbox dispute was resolved. But during a meeting over the toolbox incident on March 25, 2022, Plaintiff reported Whittle's alleged use of the highly offensive n-word in Plaintiff's presence months earlier. Plaintiff also alleged that he had received disparate disciplinary treatment in the form of an attendance warning. By March 29, 2022, he notified Defendant of an additional disparate treatment allegation about not being considered for a lead mechanic position. Plaintiff's complaint in this Court more generally alleges race discrimination because "[s]imilarly situated white employees were not placed on extended leaves of absence and were not terminated." (Doc. 1, ¶ 43, PageID 6.)

Defendant is entitled to summary judgment because Plaintiff has failed to prove any of his allegations of race discrimination by direct or indirect evidence. In the alternative, he has failed to rebut Defendant's non-discriminatory reasons for being placed on paid leave or for his termination.

There is no dispute that Plaintiff was placed on paid leave at his own request, after he told Givaudan that he was not comfortable returning to work until an investigation had been completed. But a stalemate soon ensued. In contentious meetings on April 25 and May 31, 2022, Plaintiff refused to accept Defendant's internal investigation findings - which soundly refuted Plaintiff's allegations - or to return to work. The stalemate persisted for another three and a half more months while Defendant employed two attorneys to conduct an extensive external investigation. Shortly after a September meeting,

---

[12]There is no evidence that Whittle took the toolbox, or that Plaintiff's supervisor failed to stop Whittle from taking the toolbox, because of race.

Defendants terminated Taffe, citing his "refus[al to have a respectful two way discussion" regarding his return to work.

The Court first considers Plaintiff's testimony that he either heard Whittle say or sing the n-word in late August or early September 2021. Use of such a word by a supervisor or decisionmaker undoubtedly would constitute "direct evidence" of race discrimination.

> Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was the but-for cause of an adverse action. *Amini*, 440 F.3d 350, 359. "In other words: 'Direct evidence is evidence that proves the existence of a fact without requiring any inferences.'" *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 530 (6th Cir. 2014) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). Racially insensitive statements constitute direct evidence of discrimination "only if they have some connection" to the adverse action alleged. *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012).

*Gray v. AutoZoners, LLC*, No. 22-1069, 2022 WL 16942609, at *3 (6th Cir. Nov. 15, 2022).

Here, even if a jury were to believe Plaintiff's allegation that his co-worker used the n-word in Plaintiff's presence, it is not direct evidence of race discrimination by Givaudan. An offensive utterance by a low-level co-worker on a single occasion nearly seven months prior to Plaintiff's first report of the incident is insufficient to prove a hostile work environment or Plaintiff's claim of race discrimination by Givaudan as a matter of law.

> To determine if statements are "relevant" as direct evidence of discrimination or are merely "stray remarks," courts generally consider: (1) whether the remarks were made by the decisionmaker or by an agent uninvolved in the challenged decision; (2) whether the remarks were isolated or part of a pattern of biased comments; (3) whether the remarks were made close in time to the challenged decision; and (4) whether the remarks were ambiguous or clearly reflective of discriminatory bias.

!

*Worthy v. Michigan Bell Telephone Co*., 472 Fed. Appx. 342, 347 (6th Cir. 2012) (quoting *Dep't of Civil Rights ex rel. Burnside v. Fashion Bug of Detroit,* 473 Mich. 863, 702 N.W.2d 154, 157 (2005)) (additional citation omitted).

Whittle's alleged slur is not relevant direct evidence against any decisionmaker.[13] Taffe offers no evidence that Givaudan knew or should have known of Whittle's isolated comment prior to late March 2022. And when Plaintiff finally did report it, Defendant took prompt steps to alleviate Plaintiff's concerns by offering to modify his and Whittle's schedules to avoid any possible overlap. Taffe rejected that option and elected to stay home with full pay while Defendant investigated. Ultimately, Defendant determined that it could not substantiate the remark despite an investigation in which it interviewed multiple employees, including Whittle and two employees who Plaintiff identified as witnesses. All witnesses adamantly denied that Whittle had ever used the slur, and directly called the veracity of Plaintiff's account into question. No reasonable jury could find Defendant's response to Plaintiff's report of Whittle's isolated use of a racial slur to have been inadequate. *See Watkins v. Wilkie*, No. 1:17-cv-531 (S.D. Ohio Sept. 25, 2019) (granting summary judgment where plaintiff had failed to show that offensive utterances by coworker were common or interfered with work performance, where comments not made in the presence of a supervisor and company conducted a formal fact-finding investigation upon learning of the remarks).

---

[13]Plaintiff's subjective belief (without evidence) that Whittle was motivated by racial animus when he briefly took possession of the coveted toolbox in March 2022 is even less relevant to Plaintiff's claim that Defendant should be held liable. Undermining any such inference, Whittle quickly accepted a different toolbox when a supervisor sought to diffuse the dispute. (Doc. 27-3 at PageID 894.) And a low level coworker's animus is not animus by *Defendant*.

In addition to the lack of direct evidence of racial discrimination, Plaintiff's indirect evidence does not support his claim. Plaintiff alleges that: (1) Whittle was not disciplined by a supervisor as harshly for an attendance offense; and (2) Whittle generally was treated more favorably. For indirect evidence, the familiar *McDonnell Douglas* burden-shifting framework is presumed to apply.[14]

> Under this framework, the plaintiff bears the initial "not onerous" burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. To establish a *prima facie* case of employment discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.

*White v. Baxter Healthcare Corp*., 533 F.3d 381, 391 (6th Cir. 2008) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008); *accord Clay v. United Parcel Serv*., Inc., 501 F.3d 695, 703 (6th Cir. 2007); *see also, Burnett v. Carington Health Systems*, U.S. Dist. No. 1:11-cv-324, 2012 WL 6001034 (S.D. Ohio, Nov. 30, 2012).

If a plaintiff establishes his *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. If the defendant carries its burden, the burden shifts once more back to the plaintiff to demonstrate that the defendant's proffered reason was a pretext for discrimination. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-55. (1981).

The instant record supports the first two elements of a claim, insofar as Plaintiff is a member of a protected class and a qualified mechanic. Plaintiff's identification of the

---

[14]*See McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973). *Comcast* was ambivalent about "[w]hether or not *McDonnell Douglas* has some useful role to play in § 1981 cases…" *Id*. at 1019. But *McDonnell Douglas* continues to be applied in the Sixth Circuit, with the caveat that a plaintiff still must establish that the adverse employment decision would not have occurred "but for" race. *Id.*

third element – adverse action – is less precise. In his complaint, he identifies two adverse actions: his extended leave of absence and his termination. (Doc. 1, ¶ 43). But Plaintiff's opposition to summary judgment attributes those actions to retaliation rather than to race discrimination. (Doc. 31, PageID 1523.)

To the extent that the Court considers arguments in Plaintiff's response to summary judgment to be equally directed toward his race discrimination claim, the Court considers Plaintiff's claims of: (1) disparate treatment including the attendance warning; and (2) a failure to promote Plaintiff to a "lead" position.

> "[T]o challenge a discrete act in a disparate-treatment claim, the statute requires only that a plaintiff show "some harm respecting an identifiable term or condition of employment." … Crucially, the harm does not have to be "significant" or "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id*. In short, the employment action is adverse if it leaves the employee "worse off respecting employment terms or conditions."

*McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 900 (6th Cir. 2024) (quoting *Muldrow v. City of St. Louis, Missouri*, 144 S. Ct. 967, 974 (2024), and recognizing "*Muldrow* may displace prior cases from our circuit requiring disparate-treatment plaintiffs to show heightened levels of harm.")

First up, the attendance warning. Plaintiff admitted that he violated the attendance policy. (May 31 Recording, 38:59-39:12.) But he asserted that his verbal warning was unfair, based on his perception that strict enforcement of the policy was discretionary. Rather than identifying any white comparator who was treated more favorably, Taffe complained that Whittle should have been disciplined more harshly for his more serious infraction. (Doc. 27-3, 896, 902.)

In its investigation, Defendant confirmed that Scheben had issued similar attendance warnings to both Taffe and Whittle for violations of the same policy. Plaintiff identifies no harm that resulted from the warning, which he did not complain about until months after receipt. While he cites to a minor difference in the wording of Whittle's warning, he cites to no evidence of any impact, which Bell attributed to "sloppy recordkeeping." (Doc. 25-3, PageID 599.) Perhaps most importantly, once Plaintiff complained about the attendance warning, Defendant not only refuted Plaintiff's assertion of disparate racial treatment but withdrew the discipline from Taffe's record, while leaving Whittle's in place. So even if the verbal warning was "adverse," the lack of evidence of racial animus and the swift withdrawal of the warning defeats Plaintiff's claim.[15] No reasonable jury could credit Plaintiff's claim of disparate treatment based on the attendance warning. *See also, generally*, *Rush v. E.I. DuPont DeNemours and Co.,* 911 F.Supp.2d 545, 570 (S.D. Ohio 2012).

The undersigned also rejects the general assertion, unsupported by specific facts or evidence, that Plaintiff was treated worse than white co-workers. Plaintiff does not identify any similarly situated co-workers apart from Whittle, and fails to identify any evidence of disparate treatment other than the attendance warning. Subjective beliefs, standing alone, are not evidence. Contrary to Taffe's belief that he was treated worse

---

[15]At times, an employer may reverse or rescind an employment decision that otherwise would constitute an adverse action. This may occur, for instance, when a company overrules a rash decision by a supervisor that does not comply with company policy, or when an employer discovers additional facts after investigation that support reversal of a preliminary decision. The Sixth Circuit has held that an employer is sometimes permitted to rescind an initial decision without running afoul of federal law; in essence, a "do-over." This pragmatic approach forecloses federal liability in some instances for rash-but-hollow words, while maintaining federal protections for any employee who suffers real or lasting adverse consequences. Thus, "when an employer imposes an employment action that would be an adverse employment action but then quickly reverses the action, the employee has not suffered an adverse employment action." *Keeton v. Flying J, Inc.*, 429 F.3d 259, 263 (6th Cir. 2005) (citing *Birch v. Cuyahoga Cnty. Probate Ct.*, 392 F.3d 151 (6th Cir. 2004) and *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000)).

than Whittle, Scheben hired Plaintiff at a higher mechanic level than Whittle, paid him a substantially higher wage from the outset of employment, and gave him a bonus after a shorter probationary period than the bonus offered to Whittle. *See Mitchell v. Toledo Hosp.*, 964 F.2d at 584-85 (granting summary judgment where plaintiff's affidavit in opposition to summary judgment contained nothing more than "rumors, conclusory allegations and subjective beliefs" of discrimination); *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) ("mere personal belief, conjecture and speculation are insufficient to support an inference of …discrimination"); *see also Marbury v. Abraham*, 2009 WL 4730603 (S.D. Ohio Dec. 8, 2009) ("[C]onclusory assertions, unsupported by *specific facts* made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment.") (emphasis original, quotation omitted); *L.F.P. IP. LLC v. Hustler Cincinnati, Inc.*, 533 Fed. Appx. 615, 621 (6th Cir. 2013) (quoting Rule 56 and holding that self-serving testimony was insufficient to defeat summary judgment whether statements were not supported by citations to the record).

Last, the undersigned finds no merit to Plaintiff's race discrimination claim based on a failure-to-promote – assuming such a claim is properly asserted.[16] Plaintiff complains that Defendant should have promoted him to a lead position. But there is no evidence that any lead position was ever posted, or that Plaintiff applied for any open lead position. *See Williams v. Hevi-Duty Elec. Co.*, 819 F.2d 620, 629 (6th Cir. 1987) (where plaintiff never submitted an application during the time when applications were being accepted, he did not establish a prima facie case of discrimination). In addition, Plaintiff had worked at the facility for only seven months, and does not dispute DeGraaf's statement that

---

[16]The claim does not appear in Plaintiff's complaint. (See Doc. 1).

Defendant had never promoted *any* employee to a lead position at the Carthage facility who had not worked there for at least three years.

### B. Summary Judgment on Count 2 - Retaliation Claim Count 2

#### 1. Plaintiff's Prima Facie Case

In *Watkins v. BLM Companies, LLC*, 644 F. Supp. 439, 450 (S.D. Ohio 2022), the court set out the framework for a § 1981 retaliation claim.

> The elements of a retaliation claim under § 1981 are the same as those under Title VII. *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). Accordingly, Plaintiff must demonstrate that (1) [he] engaged in protected activity; (2) [his] exercise of that activity was known by [Defendant]; (3) [Defendant] thereafter took an action that was materially adverse to [him]; and (4) there was a causal connection between the protected activity and the materially adverse action. *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). The framework for analyzing retaliation claims depends on whether there is direct or indirect evidence of retaliation. *Perkins v. Detroit Salt Co.*, No. 20-11211, 2021 WL 5989022, at *9 (E.D. Mich. Dec. 17, 2021).… When there is only circumstantial evidence of retaliation, courts use the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668, (1973) to analyze retaliation claims under § 1981.

*Id*. (additional citation omitted).

For the reasons explained below, the undersigned concludes that Plaintiff cannot prove the "causal connection" component of his retaliation claim. That said, the undersigned acknowledges that Defendant seeks summary judgment solely on the issue of pretext, without directly challenging Plaintiff's prima facie case. *But see Loggins v. Costco Wholesale Corp*., 2005 WL 2988464, *10 (W.D. Tenn. Oct. 23, 2025) (holding that plaintiff had failed to state a prima facie case for its retaliation claim despite failure of defendant to raise that issue).

As with a race discrimination claim, a plaintiff may prove a retaliation claim by direct or indirect evidence. Plaintiff asserts that he has direct evidence of retaliation in the form of a statement attributed to Plant Manager South in Bell's report under the heading "Mixed Opinions Regarding Mr. Taffe Returning to Work." Bell wrote:

> Mr. South, who was present at the April 25, 2022 meeting with Mr. Taffe and had heard about Mr. Taffe's behavior at the May 31, 2022 meeting, saw nothing to demonstrate Mr. Taffe had been discriminated against due to his race, and praised the Company for its lack of racially motivated incidents[42], advised: "Personally, I do not feel like George is energy the Company can afford at the site -- he is a risk to himself and the site's lack of racism."

(Doc. 25-3, PageID 597-598.) In footnote 42 of her report, Bell provides additional context:

> Mr. South explained that while some employees have said they believed they had been treated unfairly, including some Black employees, no one, prior to Mr. Taffe, ever mentioned race. Rather, the concerns were related to tenure and other issues.

(*Id.*, n. 42 at PageID 598.)

In the same section, Bell explains that Montgomery "was particularly vocal about not wanting Mr. Taffe to return "despite his skills and talent level [being] head over heels what we need…." (*Id.*) Montgomery stated that Plaintiff not only was "rude and disrespectful" in the April 25 meeting, but that, "as a Black man," he did not believe Taffe's allegation that Whittle had used a racial slur months earlier. Montgomery warned "the Company 'doesn't need' someone 'wanting to lie on people using a dangerous word that can get you killed,'" and expressed concern that if returned to the workplace, Taffe might act as the aggressor in workplace violence. (Doc. 25-3, PageID 598.)

"Direct evidence is evidence that proves the existence of a fact *without requiring any inferences*." *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 530 (6th Cir. 2014) (emphasis added and additional citations omitted). Even when taken out of context as

Plaintiff does on summary judgment,[17] South's reported statement in Bell's report requires an inference to interpret it as direct evidence of a retaliatory termination for making complaints, as opposed to termination for the manner in which Taffe expressed his complaints. And in context, the statement more easily lends itself to the inference that South believed: (1) Taffe's behavior on April 25 and May 31 was unacceptable; and (2) Taffe had lied about his claims of discrimination and likely would present additional spurious claims if reinstated. Having determined that no direct evidence exists, the undersigned evaluates the remaining evidence under the *McDonnell Douglas* framework.

Plaintiff is presumed to be able to satisfy the first two elements of a retaliation claim under that framework: that he engaged in "protected activity" that was "known to" the Defendant. Plaintiff's initial informal complaint of race discrimination to Scheben and to DeGraaf on or before March 25, 2022 was protected activity. And some statements at the April 25, May 31 and September 15 meetings likely enjoyed similar protection.[18]

---

[17]In his deposition testimony, Taffe mischaracterized another comment made by South. Taffe testified that South told him during the April 25 meeting that Taffe "would have a hostile work environment no matter where I go after I've complained about a racial issue." (Taffe Dep., Doc. 199-1 at PageID 196). Taffe made the same accusation at the September 15 meeting. (September 15 Recording, 9:08-9:25.) The April 25 Recording proves that South said nothing of the sort. It was Plaintiff who insisted that he feared he would return to a hostile work environment due to his complaints. South merely expressed his understanding of Plaintiff's stated concern, while disputing that concern was a basis to avoid returning to work. (Doc. 21, April 25 Recording at 9:08-9:38.)

[18]Whether the entirety of Plaintiff's statements during the March 31, April 25, and September 15 meetings were "protected" is less certain. In one case cited by Taffe, the court denied the *plaintiff's* motion for summary judgment on a retaliation claim where the employer allegedly had disciplined the plaintiff for calling her supervisor "'a f___ing racist,' 'a bigot,' and 'a piece of sh_t.'" *Covington v. Sailormen Inc*, No. 1:10-cv-252-MP-GRJ, 2011 WL 13112567, at *1 (N.D.Fla., June 3, 2011). *Id.*, at *1. Citing *Sumner v. United States Postal Service*, 899 F.2d 203 (2d Cir. 1990) and *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 401 (11th Cir. 1989), the court noted that a complaint that is presented in an "unreasonable" manner falls outside of the protection of § 1981. *Id.*, at *3. The court explained that the plaintiff had failed to prove the disciplinary action would dissuade a "reasonable employee" from making future discrimination complaints, as opposed to "merely dissuad[ing] a reasonable employee from raising such complaints in a comparable manner." *Id.* at *5. For the same reasons, the *Covington* plaintiff had failed to show that the reprimand was "causally linked" to any protected conduct.

Regarding the third element of his retaliation claim, Plaintiff's complaint alleges: "Givaudan took adverse action against [Plaintiff] after he raised concerns that he was being subject to race discrimination and that Givaudan had not conducted a fair investigation into his complaints." (Doc. 1, ¶ 48, PageID 7.) The use of the singular tense and allegation that Defendant's "stated reasons for terminating [Plaintiff] are pretext for illegal retaliation," (*id. at ¶ 50*), suggest that Plaintiff alleges that the sole adverse action at issue is termination. Consistent with that interpretation, Defendant argues on summary judgment that even assuming that Plaintiff can make out a prima facie case based on termination, "Givaudan offered a legitimate, non-retaliatory reason" for the termination and "Taffe has no evidence of pretext" regarding termination. (Doc. 29, PageID 1037.)

In response to summary judgment, however, Plaintiff asserts that Givaudan's decision to continue him on extended paid leave without his estimated overtime pay constitutes a separate and *additional* adverse action that proves his retaliation claim. Thus, before proceeding further, the undersigned must consider whether the Defendant's decision to discontinue "estimated overtime" payments on June 1 while keeping Plaintiff on leave constitutes a separate materially adverse action (beyond termination).

In *Muldrow*, the Supreme Court reiterated that an adverse action for purposes of a retaliation claim (as opposed to a discrimination claim) remains one that would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 348. There is no dispute that Defendant initially placed Taffe on administrative leave with full pay at *his* request.[19] Therefore, Defendant's *initial* accommodation is not evidence of an adverse action that would not have dissuaded a reasonable worker from making a

---

[19]Defendant initially asked Taffe to return with a modified schedule to avoid overlap with Whittle, but Taffe elected to stay away from work, with full pay, while Defendant investigated his complaints.

discrimination charge. *See Kellar v. Yunion, Inc*., ___ F. 4th ___ , 2025 WL 3039894 (6th Cir. Oct. 31, 2025) (granting a disability plaintiff's requested disability-based accommodation is not an adverse action for purposes of retaliation claim).

For the entire time he was on leave, Defendant paid Plaintiff for 40 hours per week. When he complained on April 25 that Defendant had shorted him for the overtime for which he presumably had been scheduled when he first went out on leave, South readily agreed to pay him that lost time. In addition, Defendant paid him all *estimated* overtime wages that he could have earned through May 31, 2022. Because Plaintiff remained on leave *at his own request* with no change in pay or benefits from March 25 through May 31, 2022, he can prove no "materially adverse" action during that period of time.

But what about after June 1, when Defendant ceased paying overtime? At the May 31, 2022 meeting, Plaintiff flatly refused to accept Defendant's determination that it found no merit to Plaintiff's race discrimination claim, and would not agree to a return to his shift at the Carthage facility. So as of May 31, it was Plaintiff's decision rather than Defendant's to continue him on leave. At that point, Defendant had offered to at least temporarily accommodate Plaintiff's request for altered hours that did not fully align with either second or third shifts – not to accommodate any fear of Whittle or others - but based on Plaintiff's "preference" for an unspecified "family issue." Given Plaintiff's highly adversarial and disruptive behavior at the May 31 meeting with no sign that he would ever return to work, Defendant discontinued paying estimated overtime.

This Court has previously considered what amount of proof is required for a plaintiff to make out a prima facie case when he asserts that a failure to pay overtime constitutes an "adverse action."

The Sixth Circuit has recognized that "allegations of a denial of overtime, properly supported, could constitute an adverse employment action." *Broska v. Henderson,* 70 Fed. Appx. 262, 268 (6th Cir. 2003). However, plaintiffs proceeding on this theory must demonstrate that they have "been denied overtime opportunities that others have received" and show "how much overtime [they] lost...." *Id. See also Hall v. Chapman,* No. 4:15-CV-13771, 2016 WL 7383685, at *4 (E.D. Mich. Dec. 21, 2016) ("at the very least, Plaintiff's proposed first amended complaint alleges that he was subjected to adverse action when Defendant Chapman docked Plaintiff's pay, took Plaintiff off the overtime list, and started rumors; *Broska v. Henderson,* 2003 WL 21518733, 70 Fed. Appx. 262 (6th Cir. June 30, 2003) (the denial of overtime does not constitute an adverse action absent evidence reflecting the amount of overtime lost and evidence that similarly-situated employees received the overtime plaintiff was denied); *Gates-Lacy v. Cleveland Dep't of Pub. Safety,* Case No. 1:09CV2593, 2011 WL 4368921, at 15-16, fn 2. (N.D. Ohio Sept. 19 2011) (Lost overtime opportunities can amount to an adverse employment action when the lost opportunities were "both relatively regular in their occurrence and significant in their monetary impact).

*Baggett v. City of Cincinnati*, No. 1:19-cv-1061-SKB, 2022 WL 899675 (S.D. Ohio, March 28, 2022) (granting summary judgment on gender discrimination claim), *aff'd*, 2022 WL 17337851 (6th Cir. Nov. 30, 2022).

In the record presented, Plaintiff does not point to *any* evidence regarding the amount of overtime he lost the opportunity to earn while on leave. Nor does he point to evidence that any other employee placed on such an extended leave received "anticipated" overtime pay on an indefinite basis even after Defendant asked them to return to work and they steadfastly refused. On the other hand, Defendant did not warn Plaintiff that it would cut off overtime pay if he did not immediately return to work, and does not dispute that it reduced Plaintiff's pay to exclude overtime on June 1, 2022. Solely for purposes of the pending motion, the undersigned will assume that Plaintiff has sufficient evidence to prove the first three elements of his retaliation claim for both the

denial of overtime pay on continued leave (beginning on June 1, 2022)[20] and for his ultimate termination on September 19, 2022.

That leaves the fourth element of his prima facie case, "causal connection." For that final element of his prima facie case, Plaintiff must prove that retaliation was the determinative "but for" reason for the discontinuation of overtime pay and termination. *Comcast Corp.* 140 S. Ct. at 1014.

> In the retaliation context, a causal connection between an employer's actions and a protected activity is established when the protected activity was the "but-for" cause of the alleged adverse action by the employer. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013). "But-for" causation means that the plaintiff must furnish evidence that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*.... Whether a protected activity was the but-for cause of an employee's termination is a context-specific inquiry.

*Boobnar v. AstraZenica Pharmaceuticals LP*, 758 F. Supp.3d 690, 734-735 (N.D. Ohio 2024) (citing *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020), additional citations omitted). It is not enough to show that retaliation was a motivating factor. See *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362-63 (2013). Plaintiff must instead prove that the fact that he made informal complaints (as opposed to the manner in which he proceeded) was the "but-for" cause of the reduction in his administrative leave pay and ultimate termination; *Kubik v. Central Michigan Univ. Bd. of Trs.*, 717 Fed. Appx. 577, 585 (6th Cir. 2017).

---

[20]Plaintiff cites to no case law to support his position that the continuation of his administrative leave alone constitutes an additional "materially adverse" action. Until the end of June, Plaintiff resisted all attempts to return him from leave to the third shift at Carthage. And even when he reported to Ms. Adams that he wanted to return to work, he did not specify whether he meant a return to third shift at Carthage, or some other hours or location. Based on the determination that the reduction of overtime pay on June 1 could be considered to be materially adverse, the undersigned finds no need to further consider whether the continuation of leave after June 30 was also materially adverse.

38

The record contains ample evidence that Defendant discontinued overtime pay and ultimately terminated Plaintiff based on his conduct. On the whole, Plaintiff's proof of the rigorous "but-for" causation standard appears insufficient to submit to a jury.

### 2.  Plaintiff Fails to Show Pretext

Even if a reviewing court were to disagree and conclude that Plaintiff's evidence is sufficient to establish a prima facie case on his retaliation claim, the undersigned would still recommend granting summary judgment to Defendant because Plaintiff cannot show that Defendant's articulated "legitimate, nondiscriminatory reason[s]" for the reduction in overtime pay and termination were pretextual. *See McDonnell Douglas Corp.*, 411 U.S. at 802. Taking adverse action against an employee who acts in a disruptive and adversarial manner qualifies as a legitimate non-discriminatory reason for discipline, even if the context in which the inappropriate behavior occurred involves protected activity. *See Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 399-401 (11th Cir. 1989).

In *Rollins*, the trial court determined that, notwithstanding a plaintiff's prima facie showing that her failure-to-promote was related to the plaintiff's frequent complaints of race discrimination, the *manner* in which Rollins expressed those complaints as opposed to the *fact* that the complaints were expressed provided a legitimate non-discriminatory reason for the employer's decision.  As the trial court put it:

> Defendants met their burden of rebuttal through evidence that failure to promote Rollins was due to her quarrelsome and antagonistic behavior and preoccupation that everything was racially motivated. Not only did defendants meet the light burden of rebuttal, but they proved their case far beyond a preponderance of the evidence. The evidence relating to Ms. Rollins compels the conclusion that in her career at FDLE she set herself up as the defender of black interests. In her zeal however, she permitted racial antagonism, not reason, to become her hallmark, with the result that any supervisor faced with the prospect of having to supervise her would have serious reservations and certain difficulty.

*Id.* at 400.

The Eleventh Circuit agreed that the manner in which Rollins had complained was unreasonable and was not protected conduct. In other words, evidence that she was a "disruptive complainer who antagonized her supervisors and colleagues and impaired the morale of her unit" was "an independent, legitimate basis for the denial of her promotion." *Id.*, 868 F.2d at 401. Such unreasonable expression, "even when associated with complaints of discrimination, has been held to fall outside the protection of section 704(a) and to provide the employer with a legitimate basis for its action." *Id.*

> [T]he manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable. This determination of reasonableness is made on a case by case basis by balancing the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment.

*Id.*, citing *Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1145 (5th Cir. 1981). The undersigned finds the reasoning of *Robbins* to be highly persuasive in this case. *Accord Powell v. Fluor-B&W Portsmouth LLC, No.:* 2:20-cv-1977-JLG, 2023 WL 6318096, *8 (S.D. Ohio Sept. 28, 2023), quoting *Jones v. St. Jude Med. S.C., Inc.*, 504 Fed. Appx. 473, 480 (6th Cir. 2012) ("An employee may claim protection for activities opposed to alleged discrimination so long as the manner of the employee's opposition is reasonable."); *see also Armstrong v. Index J. Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (holding that § 2000e-3(a) "was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.... An employer must retain the power to discipline and discharge disobedient employees").

Here, all evidence of record supports Defendant's explanation that it discontinued overtime pay on June 1 due to Plaintiff's disruptive behavior at the May 31 meeting. Likewise, the recordings of all three meetings (April 25, May 31, and September 15) confirm the Defendant's stated reasons for termination. In its termination letter, Defendant state that Plaintiff is being terminated for the "inappropriate and unacceptable" manner in which he conducted himself during this meetings with company representatives, including repeatedly speaking over them, refusing to "have a respectful two way discussion" regarding his return to employment, and yelling and using foul language at the May 31 meeting. (Doc. 19-3, PageID 257.)

Because Defendant offered legitimate, non-discriminatory reasons for its actions, the burden shifted to Plaintiff to show that Givaudan's articulated reasons were not, in fact, the true reasons for its actions, but were a pretext for discrimination or retaliation. In *Kalyango v. Ohio University*, 723 F. Supp.3d 627 (S.D. Ohio 2024), this Court recently set out the relevant standard.

> A plaintiff can show pretext in one of three ways by showing that the employer's stated reason:
>
> (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the employer's action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). A defendant's proffered reason cannot be proved to be a pretext "unless it is shown both that the reason was false, and that discrimination [or retaliation] was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
>
> *Harris v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).
>
> Additionally,
>
> [i]f the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable

reliance on the particularized facts before the employer when it made the decision, the plaintiff will fail to establish the basis for the decision was pretextual. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (citation omitted); *Smith v. Chrysler*, 155 F.3d 799, 807 (6th Cir. 1998) ("In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.").

*Id.*, 723 F. Supp.3d at 639-640 (quoting *Halfacre v. Home Depot, U.S.A., Inc.,* 221 Fed. Appx. 424, 430 (6th Cir. 2007)).

Plaintiff first argues that he "did nothing inappropriate" in the meetings, suggesting that he has sufficient evidence to prove Defendant's stated reasons have "no basis in fact." (Doc. 31, PageID 1523.) But the record overwhelmingly proves the opposite – that Defendant's stated non-discriminatory reasons for its adverse actions are firmly grounded in fact.

With respect to overtime pay, for example, Plaintiff admits that Givaudan paid him both his fulltime pay and overtime through May 31. He also admits that Defendant was ready to return him to work prior to the May 31 meeting, even offering to modify his hours on a temporary basis at his request for an unspecified "family reason." The cessation of overtime pay and DeGraaf's failure to respond to his messages immediately after the meeting strongly supports rather than undermines Givaudan's position that its discontinuation of overtime pay was based on Taffe's disruptive behavior on May 31 and was not based on the fact that he made a complaint of discrimination.

Plaintiff also concedes that at the April 25, May 31, and September 15 meetings, he "relentlessly shared his belief that he had been discriminated against and that Givaudan was retaliating against him," and that his tone "may have been adversarial."

(Doc. 31, PageID 1522-1523.) In his only challenge to whether Defendant's reference to his disruptive behavior was grounded in fact, Plaintiff argues that he "did not shout or curse."(*Id.*) But Plaintiff cites to no authority supporting the proposition that an absence of a "shout or curse" insulates a plaintiff from discipline for the type of highly adversarial and disruptive behavior he exhibited, and the undersigned has found none. In any event, no reasonable juror listening to the May 31 audiotape could deny that Plaintiff did in fact curse ("Fuck that n[word]") and repeatedly raise his voice. (*See*, *e.g.*, 40:00-56:10.) In sum, Plaintiff strikes out in his attempt to prove that his employer's stated reasons for the adverse actions were not grounded in fact.

For much the same reasons, Plaintiff cannot show that those stated reasons did not actually motivate Defendant or were somehow "insufficient to motivate" Givaudan's actions. *See Rollins*, 868 F.2d at 401. Plaintiff complains that this Court should not make that determination on summary judgment because it "requires weighing facts, making judgments of character, and determining… credibility." (Doc. 31, PageID 1507.) Perhaps Plaintiff's argument would be more persuasive if he had not taped the meetings. But – much like video evidence - the audio recordings provide incontrovertible evidence that supports Defendant's position that Plaintiff acted unreasonably in his words, tone and demeanor at all three meetings, and that his behavior was particularly inappropriate at the May 31 and September 15 meetings. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2017). Here, no factfinder who listens to the three recordings could find that Defendant's stated reasons

for discipline had no basis in fact, did not actually motivate Defendant, or were insufficient to support the adverse actions.

The meager evidence Plaintiff cites to support his assertion that retaliation was the real reason for his termination falls well short of proving pretext, in part because he cannot show that Defendant's proffered reasons for its actions (his disruptive behavior) were false. To prove that retaliation or discrimination was the real reason for termination, Plaintiff points to his alleged willingness to return to full employment at the end of June 2022, and to Bell's report of South's statement about his reluctance to return Plaintiff to the plant floor. Even if the referenced evidence were sufficient to raise an issue of fact on whether retaliation played a role in his termination (a conclusion the undersigned does not reach), Defendant would still win summary judgment because Plaintiff cannot prove Defendant's proffered reasons for the adverse actions were false.

In any event, Plaintiff's so-called evidence of retaliation is weak at best. Take his reported statement to Adams in late June that he wanted to return to work, without indicating whether he intended to return to third shift at Carthage (significant points of contention up to May 31).[21] Plaintiff argues that Defendant's failure to immediately reinstate Plaintiff in July is proof of retaliatory motive, because Defendant should have understood that his previous reluctance to return over "safety concerns" had fully "abated." (Doc. 31, PageID 1522). The undersigned disagrees. Plaintiff's professed new willingness to return to work at the end of June did not erase the unreasonable conduct cited by Defendant for its adverse actions. In addition, Adams' notes reflect Taffe's refusal

---

[21]On June 27, Plaintiff asked DeGraaf about a "time-table" for his return, without providing any clear indication that he wished to return to third shift at Carthage. In response, Defendant promptly reached out to Adams to obtain her report, which it did not receive until June 30.

to answer her investigatory questions and open mistrust of both Adams and Givaudan. Given the inconsistencies between Taffe's earlier statements and behavior and Adams' report,[22] it was objectively reasonable for Defendant to hire Attorney Bell to complete a more comprehensive investigation before proceeding with reinstatement. But Plaintiff refused to participate in Bell's investigation. And when Plaintiff was advised of Bell's conclusions on September 15, he continued his disruptive behavior, amplifying the grounds for his termination.

The only other evidence on which Plaintiff relies to show that retaliation was the real reason for Defendant's actions is South's comment, recorded in Bell's investigation, that he did not want to bring Goerge back due to his "energy" and based on a belief he was "a risk to himself and the site's lack of racism."  For the reasons previously discussed, the comment is susceptible to more than one interpretation. In context, it suggests little more than that South then believed (after three investigations found no merit to Plaintiff's claims and two meetings in which Taffe had acted unreasonably and inappropriately) that Taffe had lied when he first claimed that he had been the victim of racism, with a "risk" that he would continue to do so. And like Plaintiff's assertion that he suddenly believed in the Defendant's "thorough investigation" and wished to return to work at the end of June, South's remark does not erase proof of Plaintiff's unreasonable and openly hostile conduct in April, May and September – all of which supported Defendant's articulated reasons for its actions.

---

[22]Considering Taffe's deposition testimony in this case denying that he told Adams that Defendant had conducted a "thorough investigation," DeGraaf's expressed concerns about those inconsistencies appear to have been well-founded.

Finally, the case law that Plaintiff cites in opposition to summary judgment on his retaliation claim is easily distinguishable. For example, in *Hertz v. Luzenac Am., Inc*., 370 F.3d 1014, 1021 (10th Cir. 2004), the Tenth Circuit affirmed the trial court's rejection of the jury instruction, "[u]nreasonable conduct does not constitute protected activity," because the record showed insufficient evidence to warrant that instruction. But unlike Plaintiff's lengthy and disruptive tirades in this case, the facts in *Hertz* involved a single and isolated unguarded-in-the-moment retort to a supervisor's derogatory comment. The Tenth Circuit held that the "solitary event" did "not reach the threshold of unreasonableness necessary to deprive [plaintiff] of the protections of Title VII." *Id.* at 1022. Needless to say, neither *Hertz* nor any other case cited compares to the undisputed audio recordings that so clearly demonstrate the unreasonableness of Plaintiff's conduct in this case.

In sum, the law does not require automatic submission to a jury of any case in which a plaintiff charges "retaliation" before he is fired. The record presented in this case demonstrates that Plaintiff cannot prove his prima facie case on either his race discrimination or retaliation claims. In addition, even if Plaintiff could prove a prima facie case on either claim, Givaudan still would be entitled to judgment because it articulated valid, non-discriminatory reasons for the adverse actions it took against Plaintiff, which Plaintiff has failed to rebut as pretextual.

## IV.    Motion for Sanctions for Spoliation

On the same date that Defendant moved for summary judgment, it filed a motion seeking sanctions under Rule 37(e)(1) based on Taffe's alleged spoliation of evidence. The motion presents serious charges regarding Taffe's failure to preserve a cell phone

that contained evidence, including text messages between Whittle and Taffe, that likely favored Defendant. The motion seeks both an adverse-inference instruction should this case proceed to trial, and an award of attorney's fees and costs.

In response, Taffe and his counsel deny any intentional misconduct. In the alternative, Taffe argues that Defendant could have and should have made greater attempts to locate the relevant evidence from other witnesses, including Whittle.

Based primarily on the recommended grant of summary judgment in Defendant's favor, the undersigned recommends that Defendant's motion for sanctions be denied as moot.

## V.    Conclusion and Recommendation

For the reasons stated, **IT IS RECOMMENDED THAT** Defendant's motion for summary judgment (Doc. 29) be **GRANTED**, that Defendant's motion for sanctions (Doc. 30) be **DENIED AS MOOT**, and that Plaintiff's claims be dismissed with judgment to be entered in Defendant's favor.


                                        *s/Stephanie K. Bowman*
                                        Stephanie K. Bowman
                                        United States Chief Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

HENRY GEORGE TAFFE,                              Case No. 1:23-cv-700

           Plaintiff                              Barrett, J.
                                      Bowman, M.J.

       v.

GIVAUDAN FLAVORS CORPORATION,


           Defendant


**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).