**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

|  |  |
|---|---|
| HENRY GEORGE TAFFE, | Case No. 1:23-CV-700 |
| Plaintiff, | |
| v. | Judge Michael R. Barrett |
| GIVAUDAN FLAVORS CORPORATION, | **OPINION & ORDER** |
| Defendant. | |

This matter is before the Court on the Magistrate Judge's Report and Recommendation ("R&R") of December 10, 2025. (Doc. 35). Pursuant to 28 U.S.C. § 636(b)(1)(C), proper notice has been afforded to the parties that they could forfeit rights on appeal if they failed to file proper objections to the R&R in a timely manner. *See Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *see also Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019) (holding that a failure to file objections generally waives the right to appeal the district court's adoption of an R&R). Plaintiff Henry George Taffe timely objects, (Doc. 37), but the Court will overrule his objections and adopt the R&R in full for the following reasons.

## I. BACKGROUND

In August 2021, Defendant Givaudan Flavors Corporation hired Taffe as a third-shift maintenance mechanic at its facility in Carthage. In late-March 2022, Taffe and another mechanic, Bengie Whittle, had a dispute over who would be allowed to take over the bench top toolbox of Marshall Stevens, a retiring mechanic.

1

Taffe is black; Whittle is white. Whittle eventually agreed to move to another toolbox, but in a follow-up conversation with manager Dan Unterer on March 25, Taffe said that the incident was especially upsetting to him because Whittle "said or sang" a highly offensive racial slur in Taffe's presence during their company orientation nearly seven months prior.

Taffe reported that he felt unsafe continuing to work at the Carthage facility, and Unterer allowed him to leave for the night, informing Taffe that HR would follow up with him the next day. On the morning of March 26, Taffe texted HR Manager Allison DeGraaf and asked her to direct any notifications to his email address. DeGraaf assured Taffe that his concerns were being taken seriously and asked for him to provide a written statement of events so that she could begin a formal investigation.

Although Taffe initially asked DeGraaf whether he should report to work as scheduled that night, he quickly added that he did not feel comfortable doing so. Unterer had rearranged the schedule so that Taffe and Whittle would not be in the building at the same time, but Taffe told DeGraaf that he would prefer not to report until an investigation was done. DeGraaf told Taffe that the choice was his.

On March 29, Taffe met in person with DeGraaf and site development supervisor Patric Montgomery. At that meeting, Taffe alleged three incidents of racial discrimination: (1) Whittle's alleged utterance of an offensive racial slur in his presence during their training; (2) a verbal attendance warning that maintenance supervisor Mike Scheben issued to Taffe, but allegedly did not issue to Whittle; and

2

(3) Givaudan's alleged failure to include Taffe in the pool of candidates when filling a lead mechanic position. Given Taffe's complaints and stated fears for his personal safety, DeGraaf informed him that he could continue to take off work with full pay while Givaudan investigated.

After interviewing Whittle (who denied the allegation and showed DeGraaf multiple friendly text messages between himself and Taffe), the two coworkers who Taffe identified as witnesses (both of whom denied hearing Whittle use the slur at training), and other employees (who denied that Whittle had ever used the slur and consistently reported that they thought Taffe and Whittle were friends), DeGraaf was unable to corroborate or find any evidence supporting Taffe's version of events. DeGraaf also determined that Scheben had, in fact, issued a similar attendance warning to Whittle. As for Taffe's allegation that he was not considered for an open position on account of his race, DeGraaf confirmed that there had been no postings for a lead position during Taffe's time at Givaudan, and that Givaudan had never promoted anyone to a lead position at Carthage if they had not worked there for at least three years.

On April 25, Taffe met with DeGraaf to discuss the findings of her investigation. Also present were Montgomery, Unterer, and plant manager Doug South. Unbeknownst to DeGraaf or anyone else, Taffe was secretly recording the meeting on his phone. DeGraaf advised Taffe that she had found no inconsistent treatment or discrimination based upon race, but would nevertheless remove the attendance warning on Taffe's personnel file due to ambiguity over whether the policy

3

had been clearly communicated. She explained that no one could substantiate Taffe's allegation that Whittle uttered a racial slur in his presence and also reported that Givaudan had not posted a listing to fill a lead role while Taffe was employed there.

Taffe did not accept DeGraaf's findings, and as the Magistrate Judge noted, "[a]t virtually every turn, Taffe argued with company representatives and rejected the legitimacy of Defendant's findings." (Doc. 35, PageID 1567). Frequently interrupting and talking over the others present, Taffe repeatedly voiced his displeasure at the presence of Unterer and South in the meeting and raised additional complaints regarding what he believed was proof of racism at the company.

Upon Taffe's complaint that he was not being paid his full wages because estimated overtime was not included in the calculation, South agreed to "fix that," regardless of what Taffe ultimately decided to do. South directly asked Taffe what Givaudan would have to do for Taffe to feel safe and return to work. But Taffe continually questioned how he could return, and as the Magistrate Judge aptly concluded, "Taffe made abundantly clear that he neither agreed with Defendant's findings nor felt safe returning to work." (*Id.*, PageID 1570).

The meeting concluded shortly after Taffe said that he needed more time to consider whether he would return to Givaudan and under what circumstances. South stated that the ball was in Taffe's court, and Taffe agreed to render a decision by Wednesday, April 27. DeGraaf confirmed with Taffe the next day that she had removed the attendance warning and was in the process of adjusting his pay to reflect estimated overtime. The following day, April 27, Taffe emailed that he was concerned

about a "continuing hostile work environment" at Carthage and asked to be transferred to Givaudan's Edison facility.

On May 11, DeGraaf emailed Taffe to explain that there were no open positions at Edison, but did tell Taffe that he was welcome to apply for an open maintenance role at Givaudan's facility in Devon, Kentucky. Reiterating the findings of her investigation, DeGraaf asked Taffe if he planned to return to work at Carthage on May 17, the start of the next work week. Taffe responded by saying that he "would like to work at any location local that has a [sic] opportunity." (*Id.*, PageID 1572).

But on May 16, Taffe wrote to say that he had injured his knee and wanted to use "all vacation days 8 and 1 float holiday 1 day" before returning to work. DeGraaf responded by explaining the process for extended medical absences and attached short term disability paperwork, which Taffe was required to complete for an absence in excess of five days. Because Taffe did not have his Givaudan computer, she also added his employee profile into the candidate pool for the open position at Devon.

On May 22, while Taffe was still absent, he texted DeGraaf to ask if he could be slotted to work at Carthage from 7:00 pm to 3:30 am, instead of the regularly scheduled hours for second or third shift. DeGraaf said that she would check with Taffe's supervisors, but since he had been previously employed as a third shift employee, asked Taffe if third shift was acceptable. Taffe replied, "No[,] not at all." (*Id.*, PageID 1573). Taffe reiterated his desire for a position at the Devon facility and told DeGraaf that he requested the specific hours as a way to ease back into

5

employment. DeGraaf offered to "accommodate a 3-4 week transition," but said that Taffe would ultimately have to choose between second or third shift. (*Id.*).

On May 26, DeGraaf followed up with Taffe to inform him that the interview process for the Devon job had actually been completed "a couple of weeks ago," and the position was filled by another internal candidate. DeGraaf then asked Taffe to meet on May 31 to discuss his return to work at Carthage. Taffe also secretly recorded that meeting, which included Unterer and Scheben along with DeGraaf.

The meeting began with Unterer assuring Taffe that Givaudan would try to work with his time requests. Taffe responded that he was willing to work third shift "so long as Givaudan allowed him to come in and get off a couple hours early, due to a 'family thing.'" (*Id.*). From there, the meeting quickly went off the rails when Taffe accused management of calling him a liar: "I see it simple. I brought up something, somebody told me that it didn't happen. So you're telling me I lied! That's what you're telling me. . . . And no matter how you flip it, I don't want somebody to blow any smoke to tickle me to tell me something different." (*Id.*, PageID 1574).

Taffe continued to accuse Givaudan of racial discrimination, frequently interrupting the other meeting attendees (at least thirteen times, by the Magistrate Judge's count), and at points "referred to himself as 'boy,' said he was not going to the back of the bus, and said in an exaggerated tone, 'yessum, boss, can I dance for you too, get you a class of lemonade while we waits?'" (*Id.*, PageID 1575). Taffe repeated the racial slur that he had accused Whittle of uttering, told a family story having to do with "a black woman's vagina," and falsely accused South of telling him in April,

6

"hey man, it don't make no difference if you went through some type of discrimination, get on back to work, boy, yessum, yessum." (*Id.*, PageID 1576).

DeGraaf later testified to feeling uncomfortable and disrespected by Taffe, and asked her boss, Tracey Hotopp, for permission not to meet alone with Taffe in future. She also notified Taffe that Givaudan would continue to pay his salary, but would no longer be paying estimated overtime.

Despite the results of DeGraaf's investigation and Taffe's behavior at the May 31 meeting, Givaudan hired an outside attorney, Deborah Adams, to once again investigate Taffe's claims. Adams interviewed Taffe on June 20, but her notes reflect that Taffe acknowledged the company's "thorough investigation" and sought to return to work.[1] Because DeGraaf could not square the notes from Adams with Taffe's previous statements and behavior, Givaudan engaged a second outside attorney, Sue Bell, to more thoroughly investigate.

Taffe refused to meet with Bell, who instead interviewed fourteen other Givaudan employees and eventually compiled a lengthy report with supporting exhibits. As the Magistrate Judge noted, "[c]onsistent with DeGraaf's investigation, [Bell] concluded that Taffe's race discrimination complaints were without merit." (*Id.*, PageID 1580). Following receipt of Bell's report, South contacted Taffe on September 12 to request a meeting. And on September 15, Taffe met with South and Hotopp. That meeting is best summarized by the Magistrate Judge:

> South opened the meeting by stating it was to talk about a path forward, that the Company had engaged in three investigations with the third investigation being a "deep

---

[1] In sworn testimony, Taffe denied ever saying this to Adams.

dive," that no evidence was found of race discrimination, and they would like to get Taffe back to work. From the start, Plaintiff angrily protested: "I was supposed to have a start date. This investigation with Deborah Adams was done in June. . . . I had responded to her on June 27th. We're in September." Taffe was highly agitated, antagonistic and rude. He disclosed that he was recording halfway into the meeting. Similar to prior meetings, Taffe quickly launched into an accusatory rant in which, in part, he asserted that Defendant was retaliating against him. He complained that Givaudan had deliberately kept him off work during the investigation and reduced his pay, alluding to the failure to pay him estimated overtime pay since June 1.

When Hotopp explained that Defendant had hired Bell to conduct a more thorough investigation, Plaintiff angrily contradicted her, "no you didn't." Taffe then falsely accused South of telling Taffe that he would face a hostile work environment upon his return. Taffe so frequently interrupted Hotopp that South asked him to "give Tracey a moment to respond please?"

During his lengthy tirade, Plaintiff stated that he refused to be fired for insubordination and so would return if Defendant let him know "what shift you want me to go back to and what time." After being almost continuously interrupted, Hotopp asked: "I think my question for you George is, is this the way that you'd like to work because this doesn't feel –" Taffe again interrupted, saying "Now I'm not going to quit a job making $35 an hour, ma'am" and "I'm not going to do it. I don't even want to be –" but did not complete his sentence. South said, "George, let Tracey ask the question … and think about the question and please answer because this is an important question." Taffe again interrupted without answering. Based on Taffe's behavior, South and Hotopp ended the meeting. South stated, "We're not going to sit here and have this rehash." Hotopp stated: "This is not a collaborative, productive conversation, and if we're not able to do that, we're not in a position to move forward."

(*Id.*, PageID 1580-82) (internal citations omitted).

Following that meeting, Givaudan terminated Taffe's employment with the company. In a termination letter to Taffe, Hotopp cited Taffe's refusal "to have a respectful two[-]way discussion," as well as his "inappropriate and unacceptable" behavior. (*Id.*, PageID 1582). Taffe filed discrimination and retaliation charges with the Equal Employment Opportunity Commission, which eventually issued him a right to sue letter.

Givaudan moved for summary judgment, arguing that it terminated Taffe's employment based upon his behavior, and not as retaliation for reporting discrimination. (Doc. 29). Taffe responded in opposition, arguing that his activity was protected under Title VII. (Doc. 31). Upon review of the facts and the parties' briefs, the Magistrate Judge concluded that Taffe "cannot prove his prima facie case on either his race discrimination or retaliation claims," and in any event, "Givaudan still would be entitled to judgment because it articulated valid, non-discriminatory reasons for the adverse actions it took." (Doc. 35, PageID 1606).

## II.  STANDARDS OF LAW

Magistrate Judges are authorized to decide both dispositive and non-dispositive matters pursuant to 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. When objections are made to a Magistrate Judge's R&R on a dispositive matter, the Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). Upon review, the Court "may accept, reject, or modify the recommended disposition; receive further evidence; or

return the matter to the magistrate judge with instructions." *Id.*; *see also* 28 U.S.C. § 636(b)(1).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (noting that a fact is "material" only when its resolution affects the outcome of an action, and a dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). The Court views the evidence and draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party has satisfied its initial burden of showing the absence of a genuine issue of material fact, the nonmoving party may not rest on the mere allegations in the pleadings, but must instead put forth specific facts showing that there is a genuine issue for trial. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## III.   ANALYSIS

Taffe contends that the R&R "improperly discounts evidence from which a jury could find that the substance, and not solely the manner, of Taffe's complaints of race discrimination was a 'but-for' cause" for the decision to terminate his employment. (Doc. 37, PageID 1626). In short, Taffe believes that triable issues of fact remain "both as to the reasonableness of Taffe's oppositional conduct and the motive for Givaudan's adverse employment actions." (*Id.*).

10

As the Magistrate Judge observed, Taffe's opposition to Givaudan's motion for summary judgment was "based exclusively on his retaliation claim, which is a perceived abandonment of his race discrimination claim." *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). Although the Magistrate Judge addressed Taffe's race discrimination claim in the alternative, the Court need not do so here because Taffe "is not contesting the disposition of his discrimination claim." (Doc. 37, PageID 1621). The question remaining, then, is whether Givaudan is entitled to summary judgment on Taffe's retaliation claim.

To prevail on his claim of retaliation under 42 U.S.C. § 1981, Taffe must show that (1) he engaged in protected activity; (2) Givaudan knew of the protected activity; (3) Givaudan took an action that was materially adverse to him; and (4) there was a causal connection between the protected activity and the materially adverse action. *Watkins v. BLM Co., LLC*, 644 F.Supp.3d 439, 450 (S.D. Ohio 2022); *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019). Where, as here, a plaintiff presents only circumstantial evidence of retaliation, (*see* Doc. 35, PageID 1593 n.17), the Court employs the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Watkins*, 644 F.Supp.3d at 450.

Under this applicable framework, Taffe has the initial burden of demonstrating, through direct or indirect evidence, a prima facie case of retaliation. If he does so, Givaudan must then carry the burden of showing that it terminated Taffe's employment for a non-retaliatory reason. Should Givaudan succeed, then

11

Taffe may attempt to show that Givaudan's proffered reason is merely a pretext for retaliation. *Id.* at 450-51.

It is undisputed that Taffe complained of racial discrimination to Unterer on March 25, 2022, and then to DeGraaf on March 26. Givaudan does not dispute that it was aware of Taffe's protected activity (reporting alleged racial discrimination), and DeGraaf's subsequent investigation invites the inference that the company had knowledge. *See Mulhall v. Ashcroft*, 287 F.3d 543, 552-53 (6th Cir. 2002). So too does Givaudan not dispute that it took an adverse action by terminating Taffe's employment in September 2022.

Thus, the only factor seriously at issue in this stage of the *McDonnell Douglas* analysis is whether there exists a causal connection between Taffe's complaint of racial discrimination and Givaudan's termination of his employment. Taffe must show that his complaint of racial discrimination was the "but-for" cause of his firing, and not merely a motivating factor. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362-63 (2013). He cannot. The Court adopts entirely the Magistrate Judge's conclusion that there is ample evidence to show Givaudan "discontinued overtime pay and ultimately terminated [Taffe's employment] based on his conduct." (Doc. 35, PageID 1598).

Even assuming, *arguendo*, that Taffe could put forth a prima facie case of retaliation, he fails to show that Givaudan's legitimate, non-discriminatory reason for taking an adverse employment action was pretext for retaliation. Though Taffe contends that "no fair characterization of the recordings gives rise to a conclusion, as

a matter of law, that Taffe's oppositional activity was unreasonable," (Doc. 31, PageID 1523), his argument falls apart completely upon listening to the recordings that he made.

Taffe argues that "[t]he meeting recordings demonstrate that Givaudan's characterization of his behavior is hyperbolic." (*Id.*, PageID 1524). It most assuredly is not, and "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 380 (2017). As the Magistrate Judge observed, and the undersigned has confirmed, "no factfinder who listens to the three recordings could find that Defendant's stated reasons for discipline had no basis in fact, did not actually motivate Defendant, or were insufficient to support the adverse actions. (Doc. 35, PageID 1602-03).

Taffe's characterization of events is, to put it mildly, interesting. His behavior at the April 25, May 31, and September 15 meetings was obstreperous, disrespectful, offensive, and wholly inappropriate in his place of work. Taffe is correct in citing to a Tenth Circuit case for the proposition that "[a]n emotional response to a racial or religious epithet is a most natural human reaction," and "[i]t would be ironic, if not absurd, to hold that one loses the protection of an antidiscrimination statute if one gets visibly (or audibly) upset about discriminatory conduct." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1022 (10th Cir. 2004). But he neglects to include the qualifier

offered in the very next sentence: "Of course, there are limits. Actions accompanying an emotional outburst cannot be unchecked." *Id.*

Coupled with Taffe's behavior itself is the fact that he was "disruptive over a period of time," further leading to the conclusion that he shed the cloak of statutory protection by engaging in unreasonable conduct. *Bazzi v. FCA US LLC*, No. 23-CV-10097, 2024 U.S. Dist. LEXIS 215275, at *24 (E.D. Mich. Nov. 26, 2024); *see Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 584 (6th Cir. 2000) (holding that "the only qualification that is placed upon an employee's invocation of protection from retaliation . . . is that the manner of his opposition must be reasonable."). Despite his arguments to the contrary, it matters that Taffe did not effectively communicate with management and sparked hostility in workplace meetings. Upon de novo review of the R&R and consideration of Taffe's objections, the Court finds no fault with the Magistrate Judge's thorough and reasoned opinion.

## IV.  CONCLUSION

For the foregoing reasons, Taffe's objections, (Doc. 37), are **OVERRULED**, and the Magistrate Judge's R&R, (Doc. 35), is **ADOPTED in full**. Givaudan's motion for summary judgment, (Doc. 29), is **GRANTED**, and its motion for sanctions, (Doc. 30), is **DENIED as moot**.

**IT IS SO ORDERED.**

_/s/ Michael R. Barrett_
Michael R. Barrett
United States District Judge

14